UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN C. CATLEY, | ) | CASE NO. 5:21-cv-2216 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ENERGY HARBOR NUCLEAR CORP., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Pending before this Court is the motion for summary judgment filed by defendant Energy Harbor Nuclear Corp. ("Energy Harbor"). (Doc. No. 41 (Motion).) Plaintiff Shawn C. Catley ("Catley") filed an opposition (Doc. No. 47 (Opposition)), and Energy Harbor filed a reply (Doc. No. 48 (Reply[1])). For the reasons discussed herein, Energy Harbor's motion for summary judgment is granted and this case is dismissed.

I.  BACKGROUND

Energy Harbor operates the Davis-Besse Nuclear Power Station ("Davis-Besse") in Oak Harbor, Ohio. It is undisputed that, as the operator of a nuclear power station, Energy Harbor is obligated to follow regulations promulgated by the Nuclear Regulatory Commission ("NRC"), which include requirements that Energy Harbor establish, implement, and maintain (1) an "access

---

[1] In its reply, Energy Harbor chastised Catley for violating a number of the Court's local rules. Energy Harbor, however, also violated this Court's Local Rules. Like Catley, Energy Harbor included unredacted personal data identifiers in exhibits filed with its motion, which violated LR 8.1(a). (*See* Doc. No. 51 (ordering both parties to refile certain documents that contained improper personal data identifiers).) This Court reminds counsel for both parties of their obligation to adhere to this Court's local rules when appearing before it.

authorization program," 10 C.F.R. § 73.56, and (2) a "fitness-for-duty" program. *Id.* § 26.23. (*See* Doc. No. 47, at 21.[2])

Energy Harbor's access authorization program is required to monitor employees seeking access to the secured areas of nuclear facilities. Under this program, Energy Harbor must "provide high assurance" that employees "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security[.]" *Id.* § 73.56(c). If an employee is deemed "trustworthy and reliable," then Energy Harbor can grant that employee "unescorted access authorization" to protected areas of the nuclear facility. *See generally id.* § 73.56. Once granted, unescorted access is subject to constant monitoring and may be reassessed. *Id.* § 73.56(f). Under the program, employees are required to report any concerns "related to any questionable behavior patterns or activities of others[.]" *Id.* § 73.56(f)(3). Such a report triggers a reassessment of the reported employee's authorization. *Id.* If during a reassessment an official believes the employee's "trustworthiness or reliability is questionable," the official must terminate the employee's unescorted access during the review period. *Id.*

Energy Harbor's fitness-for-duty program must "(a) [p]rovide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse; (b) [p]rovide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties; (c) [p]rovide reasonable measures for the early detection of individuals who are not fit to perform the duties that require them to be

---

[2] Unless otherwise indicated, all page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system.

2

subject to the [fitness-for-duty] program; (d) [p]rovide reasonable assurance that the workplaces subject to this part are free from the presence and effects of illegal drugs and alcohol; and (e) [p]rovide reasonable assurance that the effects of fatigue and degraded alertness on individuals' abilities to safely and competently perform their duties are managed commensurate with maintaining public health and safety. *Id.* § 26.23. Failure to meet the fitness-for-duty requirements can result in an employee's unescorted access authorization being denied or revoked. *See id.* §§ 26.53; 26.77(b).

Both parties agree that these programs and their mandating regulations are "important" safeguards in the nuclear industry. (Doc. No. 47, at 21; Doc. No. 41, at 10–11 (quoting *Tomek v. STP Nuclear Operating Co.*, No. 3:17-cv-340, 2018 WL 4403281, at *2 (S.D. Tex. Aug. 28, 2018) ("The obvious purpose of these various laws and regulations is to ensure that nuclear facilities are properly operated to protect the public from a catastrophic accident.")).)

In February 2020, Catley began working as a contracted pipefitter at Davis-Besse. (Doc. No. 52 (Declaration of Shawn C. Catley) ¶ 18.) Catley testified that *all* his work at Davis-Besse was done in protected areas and, thus, Catley was required to obtain and maintain unescorted access authorization. (Doc. No. 56 (Catley Deposition Transcript and Exhibits), at 43:12–16.[3]) Initially, Energy Harbor granted Catley unescorted access. (*Id.* at 43:9–11.)

On March 11, 2020, Catley went through the required daily security screening at Davis-Besse. The security officer performing the screening saw two pill bottles in Catley's bag containing Catley's prescribed opioids, Oxycodone and Xtampza. (*Id.* at 55:21–57:21.) Security notified

---

[3] Because Energy Harbor refiled the depositions transcripts without removing the previously generated document header, the page numbers assigned by the electric filing system are illegible on these documents. (*See* Doc. Nos. 53–56.) For this reason, the Court will use the PDF page numbers for citations to the deposition transcripts and exhibits.

Brenda Thorbahn ("Thorbahn"), Supervisor, Access Authorization that the pills had been discovered in Catley's bag. (Doc. No. 55 (Thorbahn Deposition Transcript and Exhibits), at 11:8–13.)

Although the exact timeline of events is not entirely clear, it is undisputed that the following events occurred at some point either on March 11, 2020, or within a few days thereafter. Catley spoke with Thorbahn and a nurse from the plant's Health Services department. (*See* Doc. No. 52 ¶¶ 22–27.) During that conversation, the nurse examined the two pill bottles and conducted a pill count. (*Id.* ¶ 23; *see also* Doc. No. 55, at 48:20–24.) Catley also met with Davis-Besse's Medical Review Officer ("MRO"). (Doc. No. 52 ¶ 28; *see also* Doc. No. 55, at 37:6–38:9.) The MRO interviewed Catley about his history of taking the medications, his current use of the medications, and the side effects. (*See* Doc. No. 52 ¶ 30; Doc. No. 56, at 67:10–25.) The MRO directed Catley to meet with a clinical psychologist, which Catley did via videoconferencing. (Doc. No. 55, at 37:16–19; Doc. No. 56, at 70:21–23.) At some point, Catley also spoke with Davis-Besse's Reviewing Official, Robert Fitzgerald ("Fitzgerald"). (*See* Doc. No. 52 ¶ 33.)

Ultimately, both the MRO and the clinical psychologist opined that Catley's unescorted access authorization should be revoked. (*See* Doc. No. 54 (Fitzgerald Deposition Transcript and Exhibits), at 22:8–12; Doc. No. 55, at 54:18–22, 60:11–13; *see also* Doc. No. 55, at 198 (Exhibit 8 (Adjudication of Potentially Disqualifying Information)); *id.* at 203 (Exhibit 11 (Stress Center Recommendation)).) Fitzgerald drafted a report summarizing the investigation and recommended that, based on his review of the information collected, Catley's unescorted access should be revoked because the "MRO could not with high degree of assurance conclude that [Catley,] while taking the said medications[,] could perform his work at a nuclear facility in a safe manner" and

4

because "[a] determination of trustworthiness and reliability [could] no longer be established." (Doc. No. 55, at 205–07 (Exhibit 12); *see also* Doc. No. 54, at 33:11–18.)

Fitzgerald sent his report and recommendation to Thorbahn, who was the person ultimately responsible for deciding whether to revoke Catley's unescorted access authorization. (Doc. No. 55, at 65:3–22.) In the end, Thorbahn concluded that Catley's unescorted access authorization should be revoked for two reasons: (1) because of his "[f]ailure to disclose [m]edication" and (2) because Energy Harbor "[c]ould not establish suitability to maintain [u]nescorted [a]ccess." (*Id.* at 246 (Unescorted Access Denial Notification).)

Specifically, Thorbahn testified that she decided to revoke his authorization because "[the] MRO and a licensed psychologist deemed that he could not work safely on safety equipment in the power station" because of his medications and their potential side effects, even if taken more than five-hours before work. (*Id.* at 38:2–7; 54:18–22; 103:10–12.) She further testified that she believed Catley was taking his prescribed opioids while at work because the nurse discovered 16 pills were missing from the bottle during her pill count, which the nurse determined would suggest Catley was taking the pills during working hours. (*Id.* at 48:20–49:6.) Thorbahn acknowledged that Catley provided explanations for the missing pills,[4] but she testified that she "did not like that his story kept changing each time we talked with him." (*Id.* at 52:4–7; *see also id.* at 51:12–19; 52:8–53:6.) Thorbahn recounted that "[d]uring . . . discussions with [her] peers, with [her] staff to include the nurse and the MRO, [the] discussion was that [Catley] was not being honest[.]" (*Id.* at

---

[4] When asked why he brought the pills into the plant as well as the reason for the discrepancy in the pill count, Catley proffered the following explanations: (1) that he felt he needed to have the pills in their bottles with him at all times in case he was called for a drug test and had to explain the presence of the opioids in his system, (2) he was concerned that the pills would be stolen at the hotel, and (3) that he used a pill organizer, which accounted for the discrepancy in pill count. (Doc. No. 56, at 59:2–19, 61:11–62:18; Doc. No. 55, at 31:14–20, 51:9–19.)

5

53:4–6.) Additionally, Thorbahn testified that she believed Catley should have reported his prescriptions to Energy Harbor during his onboarding process. (*Id.* at 17:16–18:25.)

Catley appealed Energy Harbor's revocation of his unescorted access authorization. (Doc. No. 56, at 83:9–11.) In accordance with Energy Harbor's procedures, the adjudication was reviewed by an independent reviewer, who was tasked with determining whether Energy Harbor's decision should be upheld. (Doc. No. 55, at 71:23–72:24.) The independent reviewer determined there was insufficient evidence to substantiate Energy Harbor's determination that Catley willfully failed to disclose his prescribed medication (*id.* at 74:21), but ultimately upheld Energy Harbor's revocation of Catley's unescorted access because the evidence supported Energy Harbor's finding that Catley could not meet the fitness-for-duty standards because of his prescribed medication. (*Id.* at 74:16–18; Doc. No. 56, at 285–86 (Appeal Review Determination).) Specifically, the independent reviewer found that:

> Once Access Authorization (AA) staff became aware of the prescription medications, they questioned the potential impact of the medications on Mr. Catley's ability to safely perform his job function and in accordance with site procedure, sent Mr. Catley to the MRO for a professional medical assessment. The MRO conducted an interview with Mr. Catley, reviewed the medications that were prescribed, and reviewed additional medical records provided by Mr. Catley. The MRO's final determination of fitness was based on the assessment of Mr. Catley's medications, physical condition and job responsibilities. The MRO concluded that he did not have reasonable assurance that Mr. Catley could safely and competently conduct his job functions and accordingly recommended denial of unescorted access.

(*Id.* at 286.)

Catley then asked the NRC to review Energy Harbor's adjudication of his access. (*Id.* at 92:16–21.) The NRC ultimately concluded that Energy Harbor abided by all applicable regulations when adjudicating Catley's claim and, thus, found no reason to vacate Energy Harbor's denial of

Catley's unescorted access. (*Id.* at 287 (Exhibit K); *id.* at 294 (Exhibit L).) Thereafter, Catley filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at 299 (Exhibit M).) The EEOC issued a right-to-sue letter on September 16, 2021. (*Id.* at 300 (Exhibit N).) On November 22, 2021, Catley filed the instant action against Energy Harbor raising two claims: (1) disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 and (2) disability discrimination under Ohio's ADA counterpart, Ohio Rev. Code § 4112.02(A). (*See generally* Doc. No. 1.)

On January 20, 2023, Energy Harbor filed a motion for summary judgment as to both claims. (Doc. No. 41.) On February 17, 2023, Catley filed an opposition (Doc. No. 47), and on March 3, 2023, Energy Harbor filed a reply (Doc. No. 48). The matter is now ripe for the Court's review.

## II. Legal Standard – Motion for Summary Judgment

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v.*

7

*Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). In most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Under this standard, "the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment [motion]." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks and emphasis omitted) (citing *Anderson*, 477 U.S. at 247–48).

### III. DISCUSSION

Energy Harbor contends that it is entitled to summary judgment on Catley's claims of disability discrimination under both the ADA and Ohio Rev. Code § 4112.02(A) because Catley cannot establish that he is a "qualified individual" under the ADA.[5]

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Discrimination includes "limiting, segregating, or classifying" an employee "in a way that adversely affects the opportunities or status" of the employee "because of" the employee's disability. *Id.* § 12112(b)(1). "Disability" includes "being regarded as having such an impairment[.]" *Id.* § 12102(1)(C); *Pena v. City of Flushing*, 651 F. App'x 415, 419 (6th Cir. 2016). Ohio Rev. Code § 4112.02 also prohibits disability discrimination in the employment context. Courts routinely "employ the same analysis" for claims brought under the Ohio's disability discrimination statute and the ADA. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007).

To recover on a claim for discrimination under the ADA, an employee must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc) (abrogating *Monette* in part by holding that a plaintiff must show that he or she suffered an adverse employment action

---

[5] Energy Harbor argues, alternatively, that Catley's state-law claim is preempted, and Catley failed to exhaust his administrative remedies for both his ADA and state-law claims. (Doc. No. 41, at 12–17.) Because the Court finds that Catley cannot establish the elements of his disability discrimination claim under either the ADA or Ohio law, the Court need not decide whether Ohio's disability discrimination statute is preempted by federal regulations or whether Catley exhausted his administrative remedies.

"because of" rather than "solely by reason of" disability). A plaintiff may establish their ADA claim "by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination[.]" *Monette*, 90 F.3d at 1178 (citation omitted).

Even if Energy Harbor took an adverse employment action[6] against Catley because it "regarded" Catley "as being disabled" due to his prescribed medications[7] (Doc. No. 47, at 13, 16), Catley's disability discrimination claims fail because he cannot establish that he was "otherwise qualified" for the pipefitter position at Davis-Besse while taking those medications.

---

[6] Although Catley never clearly articulates what the "adverse employment action" was giving rise to his claims, the Court assumes it was Energy Harbor's decision to revoke his unescorted access authorization because that is where Catley focuses his discussion. Indeed, Catley acknowledges that Energy Harbor submitting him for a fitness-for-duty review is not considered an adverse employment action under Sixth Circuit case law. (Doc. No. 47, at 21–22 ("The Sixth Circuit Court of Appeals has consistently held that FFD examinations alone do not establish a perception of disability and such examinations are not adverse employment actions in the context of civil rights statutes." (citing among authority *Belasco v. Warrensville Heights City Sch. Dist.*, 86 F. Supp. 3d 748, 763 (N.D. Ohio 2015), *aff'd*, 634 F. App'x 507 (6th Cir. 2015))).)

[7] Energy Harbor insists in its motion for summary judgment that it revoked Catley's unescorted access authorization because Thorbahn and the MRO determined that Catley did not meet the NRC's "trustworthy and reliability" standard based on Catley's decision not to disclose his medications to Energy Harbor and because of Catley's "shifting explanations" for his actions. (Doc. No. 48, at 1, 6.) While Thorbahn did testify that she did not believe Catley's "shifting explanations" and thought he should have disclosed his medications, Thorbahn also unequivocally testified that "[t]he denial of access was because [the] MRO and a licensed psychologist deemed that he could not work safely on safety equipment in the power station" because of the medication Catley was prescribed. (Doc. No. 55, at 54:18–22.) Documentation produced by Energy Harbor supports Thorbahn's testimony. (*Id.* at 205–07.)

There is no evidence, however, that Catley's authorization was revoked because Energy Harbor regarded him as a drug abuser. Fitzgerald did testify that he thought Catley was abusing prescription drugs (Doc. No. 54, at 30:25–31:3), but Fitzgerald was not the final decision-maker and there is no evidence that Fitzgerald communicated his belief to Thorbahn (who was the ultimate decision-maker). Thorbahn testified repeatedly that she did not have any reason to believe Catley was abusing his prescription drugs. (*E.g.*, Doc. No. 55, at 82:19–20.) She did testify that she believed Catley was taking his prescription drugs at work (*id.* at 49:4–6), which might equate to drug abuse, but she remained adamant that her reason for revoking Catley's access was not because he was prescribed opioids, but because the MRO opined that Catley's prescribed opioids, and their side effects, made it unsafe for Catley to work in Energy Harbor's nuclear power plant. *See Bell*, 351 F.3d at 247 (finding a mere "scintilla of evidence" is insufficient to defeat an otherwise proper summary judgment motion).

10

Catley "bears the burden of establishing" that he is "'otherwise qualified' for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation." *Monette*, 90 F.3d at 1186. "[Q]ualified,' . . . means that the individual satisfies the requisite skill, experience, education and *other job-related requirements* of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m) (emphasis added). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." *Id.* § 1630.2(n). If the plaintiff establishes that he or she was otherwise qualified, the employer then "bear[s] the burden of proving that a challenged job criterion is essential . . . or that a proposed accommodation will impose an undue hardship upon the employer." *Monette*, 90 F.3d at 1186.

Meeting the fitness-for-duty standards to maintain unescorted access authorization were undeniably essential functions of Catley's job as a pipefitter at Davis-Besse. Catley even conceded that all his work took place in protected areas, which he could access only with authorization. (Doc. No. 56, at 43:12–16.) Further, Catley does not allege that he asked, nor does he ask now, for a reasonable accommodation. (*Cf.* Doc. No. 52 ¶ 5 ("I have never requested reasonable accommodation as I am currently able to perform my job without accommodation.").) Instead, Catley essentially asks for an exemption from Energy Harbor's fitness for duty determination. He contends repeatedly through his opposition brief that he was otherwise qualified for the pipefitter position at Energy Harbor because of his background, skills and experiences and because his prescribed medications did not actually interfere with his ability to work safely. (*See, e.g.*, Doc.

11

No. 47, at 17–18 (citing Doc. No. 52 ¶¶ 3, 9, 11)). Catley contends he never took his prescribed medications during or within five hours of starting his shifts and he personally never experienced any side effects of his medications while at work. (*Id.* at 4–5 (citing Doc. No. 52 (Catley Declaration) ¶¶ 8–9).) But Catley has produced no evidence indicating that his prescribed medications do not have side effects that might impair the ability of a pipefitter to work safely in a nuclear facility. In fact, Catley acknowledges the "physical and mental impairment associated with opioid use" (Doc. No. 52 ¶ 6), which is exactly what Thorbahn testified that the MRO considered in finding that he could not ensure that Catley could work safely at Davis-Besse while taking his prescribed opioids, even when taken outside the five-hour window. (Doc. No. 55, at 38:2–7; 54:18–22; 103:10–12.)

Relying on its MRO's finding, Energy Harbor determined that Catley could not satisfy its fitness-for-duty standards.[8] *See Mathieson v. Am. Elec. Power*, Nos. 1:00-cv-870, 1:00-cv-871, 2002 U.S. Dist. LEXIS 6560, at *10 (W.D. Mich. Jan. 14, 2002), *report and recommendation approved and adopted by* 2002 U.S. Dist. LEXIS 3051 (W.D. Mich. Feb. 20, 2002) (available on Lexis only) ("Plaintiff concededly did not satisfy the requirements of the fitness-for-duty program, because of his use of the prescription drug . . . . An employee's inability to satisfy a legally dictated fitness-for-duty program is 'by its very nature an essential function under section 12111(8).'" (quoting *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998))). Because Catley

---

[8] As noted earlier, Energy Harbor initially also revoked Catley's unescorted access authorization for "willful omission" because he did not disclose his prescribed opioids to Energy Harbor. (Doc. No. 55, at 246 (Unescorted Access Denial Notification).) The parties wholeheartedly dispute whether Energy Harbor's policies and procedures actually required Catley to disclose his prescriptions during the on-boarding process, but this disagreement is immaterial because, on appeal, the independent reviewer agreed with Catley and vacated Energy Harbor's willful omission finding. (Doc. No. 56, at 286 (Appeal Review Determination).)

12

could not satisfy Energy Harbor's fitness-for-duty standards, his unescorted access authorization was revoked, and he was no longer qualified for the pipefitter position. *See McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017) ("NRC regulations require [employees] to be fit for duty and to maintain unescorted security clearance. Because [plaintiff] did not satisfy either legally mandated requirement at the time he was fired, his claim failed as a matter of law." (citations omitted)) (collecting cases).[9]

Catley could only be "otherwise qualified" for the pipefitter position if Energy Harbor eliminated the fitness-for-duty standards or ignored its MRO's findings that Catley's prescribed medications had side effects that might impact his ability to work safely in a nuclear facility. But even so, Energy Harbor has clearly met its burden of proving that compliance with the fitness-for-duty standards is essential because it is required by law—Energy Harbor has no authority to eliminate or ignore the NRC regulations mandating fitness-for-duty standards.

"[Energy Harbor] did not choose to implement a fitness-for-duty program, nor did it choose the components thereof." *See Mathieson*, 2002 U.S. Dist. LEXIS 6560, at *10. NRC regulations legally obligate Energy Harbor to make the type of determination it made concerning the potential impact of Catley's prescribed medication on his fitness for duty at its nuclear facility. Potential

---

[9] Catley faults Energy Harbor's reliance on *McNelis*, claiming it "was the first and only court" to "cut off [a] plaintiff's claim at the *prima facie* stage of the ADA inquiry, essentially holding that in effect, NRC regulations wholly trump the ADA." (Doc. No. 47, at 20–21.) Catley contends that following this application will allow "any action taken by a nuclear operator under the guise of an FFD examination [to] be immune to any scrutiny under the ADA." (*Id.* at 21 (emphasis omitted).) Since *McNelis*, however, at least one other circuit has found its reasoning persuasive. *See Flaherty v. Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 55 (1st Cir. 2019) (finding plaintiff was not "qualified" individual after his unescorted access authorization was revoked). Absent guidance from the Sixth Circuit, this Court also finds *McNelis* persuasive, including the *McNelis* court's observations that "because of the sensitive nature of the work, the [NRC] made a policy judgment that for a limited number of jobs, nuclear power plants must screen employees for certain traits and behaviors that may endanger the public. . . . And the premise that the ADA applies differently to professions that implicate the public welfare is as essential as it is unremarkable." *McNelis*, 867 F.3d at 416–7 (citations omitted).

side effects from medication can render an employee unfit under NRC regulations. Energy Harbor was legally barred from maintaining Catley's unescorted access authorization once it determined that it could not reasonably ensure that he met its fitness-for duty-standards.[10] *Id.* ("Plaintiff did not meet [the fitness-for-duty] qualification, and [the nuclear facility's operator] was [not] at liberty to ignore it."); *see also id.* at *11 ("[T]he inability to meet the requirements of federal regulations concerning access to regulated nuclear power plants requires a finding that an ADA plaintiff is not a 'qualified individual.'" (quoting *McCoy v. Pa. Power & Light Co.*, 933 F. Supp. 438 (M.D. Penn. 1996); *McDaniel v. AlliedSignal, Inc.*, 896 F. Supp. 1482 (W.D. Mo. 1995))); *McNelis*, 867 F.3d at 416–17 ("The NRC regulations do not exempt individuals with disabilities, and indeed, it would be strangely ineffective for them to do so; . . . [t]o the contrary, NRC regulations explicitly require nuclear power plants to screen for traits and behaviors in a manner that in other contexts may violate the ADA."). Even more, neither Energy Harbor, nor this Court, is at liberty to second guess its MRO's determination.[11] 10 C.F.R. § 26.189(d) ("Neither the individual nor licensees . . . may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional . . . ."); *McNelis*, 867 F.3d at 418 ("The Supreme Court has indicated that in the ADA context, a court should not 'second-guess' a

---

[10] To the extent Catley is arguing Energy Harbor did not follow NRC regulations properly, (*see* Doc. No. 47, at 10–12), he has not established that there is any private right of action for alleged violations of federal regulations governing fitness-for-duty programs in nuclear facilities. *See Brown v. Ne. Energy Co.*, 48 F. Supp. 2d 116, 121 (D. Conn. 1999). Catley had an opportunity to challenge Energy Harbor's compliance with the NRC's regulations before the NRC directly, which he did. Ultimately, however, the NRC determined that Energy Harbor did not violate any NRC regulations in its adjudication of Catley's unescorted access authorization. (Doc. No. 56, at 287 (Exhibit K); *id.* at 294 (Exhibit L).)

[11] The Court acknowledges the possibility that a different MRO might (and perhaps in the past did) come to a different conclusion concerning the effect of Catley's prescriptions on his ability to work safely in a nuclear facility (*see* Doc. No. 52 ¶ 27), but that does not negate Energy Harbor's MRO's concerns nor Energy Harbor's ultimate decision to revoke Catley's unescorted access authorization because of the MRO's concerns about the prescribed medications and the potential side effects.

physician's determination that an employee failed to meet the regulatory requirements of his job." (quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 522, 119 S. Ct. 2133, 144 L. Ed. 2d 484 (1999))).

For all the aforementioned reasons, Catley has failed to establish that he was otherwise qualified for the pipefitter position because he failed to meet Energy Harbor's legally mandated fitness-for-duty requirements. Thus, Catley's disability discrimination claims fail as a matter of law and Energy Harbor is entitled to judgment in its favor on the same.

## IV. CONCLUSION

For all the aforementioned reasons, Energy Harbor's motion for summary judgment is GRANTED. (Doc. No. 41.) Catley's claims against Energy Harbor are DISMISSED and this case is CLOSED.

**IT IS SO ORDERED**.

Dated: July 11, 2023

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT COURT**
**CHIEF JUDGE**